# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MANEA ORTANSA MIRELA, | Civil Action No. |
| Petitioner, | 3:18-cv-537 (CSH) |
| v. | |
| UNITED STATES OF AMERICA, | SEPTEMBER 20, 2019 |
| Defendant. | |

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS [Doc. 2]

**Haight, Senior District Judge:**

In this habeas corpus action, Petitioner Manea Ortansa Mirela ("Manea"), a native citizen of Romania who is also a naturalized citizen of the United States, resists Romania's request that the United States extradite Manea to Romania to face prosecution and punishment for crimes she allegedly committed in Romania and for which she was tried and convicted *in absentia* by Romanian courts. The question presented, after a hearing and extensive briefing, is whether Manea is entitled to habeas relief barring her extradition.

## I.    PROCEDURAL BACKGROUND

The Extradition Act, 18 U.S.C. § 3181 *et seq.*, governs procedures for extradition of an individual from the United States to a foreign country. Section 3184 provides that "[w]henever there is a treaty or convention for extradition between the United States and any foreign government," a federal judge receiving a complaint charging any person "with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention" may arrest the individual and conduct a hearing to determine whether there is

evidence "sufficient to sustain the charge under the provisions of the proper treaty or convention," in which event the judge "shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention," and shall also "issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made." Section 3186 provides: "The Secretary of State may order the person committed under § 3184 of this title to be delivered to any authorized agent of such foreign government, to be tried for the offense of which charged. Such agent may hold such person in custody, and take him to the territory of such foreign government, pursuant to such treaty."

What generally occurs is that a foreign government (the "Requesting State," in the diplomatic parlance of treaties) sends to the United States Secretary of State a request that, pursuant to an extradition treaty between the two nations, a particular individual be extradited from the United States to the foreign country for trial on specified crimes committed in that country. If the State Department finds the form of the extradition request to be in order, it refers the matter to the Department of Justice, which sends the request to the United States Attorney for the district in which the sought-after individual may be found. The United States Attorney then applies to the district court pursuant to § 3184 for the arrest of the individual, an extradition hearing before the district court, and the court's certification to the Secretary of State that the individual is extraditable. If the district court makes that certification, the Secretary decides whether to allow or refuse extradition.

The case at bar follows that scenario. Romania addressed its request for the extradition of Manea to the Secretary of State pursuant to an Extradition Treaty between the United States and

Romania. In the litigation attendant upon Manea's opposition to extradition, the United States Attorney's Office for this District represented the Secretary of State, who was responding diplomatically to Romania's request under the Treaty. Manea was represented by the Federal Defender Office of this District. That representation of counsel is the same in this habeas action.

In August 2015, Magistrate Judge Margolis of this Court signed a complaint and arrest warrant for Manea. Judge Margolis acted on the application of the United States ("the Government") on behalf of Romania. Romanian authorities drafted the complaint, which charged Manea with convictions *in absentia* by Romanian courts of crimes involving deceit, forgery and fraud in connection with several loans that companies officered by Manea obtained from Romanian banks. Manea was arrested in this District on August 14, 2015, and released on bond.

In August 2016, the Government, continuing to act on behalf of Romania, filed a motion for the extradition of Manea from the United States to Romania for prosecution and punishment on the Romanian crimes of conviction. Manea opposed extradition. Judge Margolis received two rounds of briefs of counsel and multiple exhibits, conducted a hearing, and signed a 62-page ruling which granted the Government's Request for Extradition. That Ruling, signed on March 1, 2018, is reported at 2018 WL 1110252.[1]

On April 5, 2018, Judge Margolis signed a further Ruling, 2018 WL 1634393, which is captioned: "Ruling on Motion for an Extradition Certification and Committal Order and on Motion to Stay Execution of Ruling and Certificate of Extradition and Motion to Continue and/or Modify Conditions of Release Pending Habeas Review." That caption reflects Manea's determination to

---

[1] *See Matter of Extradition of Manea*, No. 15-MJ-157 (JGM), 2018 WL 1110252, at *1 (D. Conn. Mar. 1, 2018).

continue resistance to extradition, this time in the form of a habeas corpus petition. Judge Margolis's April 5, 2018 Ruling granted Manea's motion for a stay of the certificate of extradition pending the habeas review. On April 11, 2018, Judge Margolis signed an "Order and Certification for Extradition and Stay of Extradition Order" [Doc. 81] which certified the extradition of Manea "to Romania, on all offenses for which extradition was requested" and, consistent with the April 5 Ruling, stayed that certification pending a habeas review.

Thereafter, Manea filed a Petition for a Writ of Habeas Corpus [No. 3:18-CV-537], assigned to the calendar of the undersigned. The case has been further briefed by counsel. A hearing before this Court was conducted on May 2, 2019. Decision was reserved on the disputed question of whether Manea is entitled to habeas relief from the Certification for Extradition to Romania issued by Magistrate Judge Margolis. That question turns upon the provisions of the Extradition Treaty between the United States and Romania, and the present state of habeas corpus jurisprudence in cases where extradition is challenged.

This description of the Procedural Background requires a reference to a letter dated March 5, 2018 from the United States Attorney to counsel for Manea [Doc. 76-2]. The letter accurately states at 1 that, as of that date, Magistrate Judge Margolis had "issued an order granting the Government's request that Manea be extradited to Romania," but "has not yet issued an Extradition Certification Order, which is a prerequisrite to further proceedings in the extradition." The United States Attorney's letter then undertook to explain to Manea's counsel the Government's perception of how those extradition proceedings should progress.[2] "Certification," in the Government's view,

---

[2] This letter was part of a praiseworthy and professional ongoing dialogue between the attorneys in the case.

"does not constitute a final order and is not directly appealable. It is subject only to a limited review by way of a petition for a writ of habeas corpus to the district court." Letter at 2. The United States Attorney then delivered this advice "regarding timing and the need to seek a court-ordered stay":

> The Department of State has informed us that, in this case, the Secretary will render a decision on this extradition no sooner than fourteen days after the date the Certification Order is entered on the court's docket.
>
> If the fugitive properly files a habeas petition challenging the Certification Order before the Secretary renders a decision, the Secretary will suspend review of this extradition, and will restart the review only if and when the district court denies the petition.
>
> Consequently, if a habeas petition is filed within the fourteen days from the date the Certification Order is entered on the court's docket, there is no need for the fugitive to seek a court-ordered stay of surrender during the pendency of the habeas litigation in the district court because the Secretary will not issue a surrender warrant, and the fugitive will not be surrendered to the foreign authority unless and until the district court denies the petition.
>
> In other circumstances, if the Secretary decides to grant the extradition request, surrender may proceed unless the fugitive has sought and obtained a court-ordered stay.

*Id*. at 2-3. The particular circumstance contemplated by the Government's March 5, 2018, letter came to pass when on March 30, 2018, Manea filed a petition for habeas corpus challenging the extradition order Magistrate Judge Margolis said she intended to sign. On April 11, 2018, Magistrate Judge Margolis issued that order, which certified Manea's extradition to Romania and stayed execution of the certification pending habeas review.

Given this procedural posture, as of the present date the Secretary of State has neither reviewed Romania's request to extradite Manea, nor decided whether to grant or refuse that request. That is so, whether the Secretary has been precluded by Judge Margolis's order staying her

extradition certification, or the Secretary is following his practice described in the Government's March 5 letter and suspended review of the extradition pending the Court's consideration of Manea's habeas motion. It makes no practical difference. The course the case will take before the Secretary depends upon this Court's decision on Manea's present habeas petition. This Ruling decides it.

## II.    THE EXTRADITION TREATY

As noted in Part I, an extradition case in a federal district court begins with an analysis of the extradition treaty between the United States and the foreign nation seeking the extradition of a named individual. In the case bar, Romania requests the extradition of Manea pursuant to a treaty between Romania and the United States.

The Extradition Treaty between the United States and Romania currently in force was signed on behalf of the two nations on September 10, 2007. The relevant provisions are these:

Article 1 of the Treaty, captioned "Obligation to Extradite," provides: "The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons to whom the authorities in the Requesting State have charged with, found guilty of, or convicted in an extraditable offense." Article 2(1) provides: "An offense shall be an extraditable offense if it is punishable under the laws in both Parties by deprivation of liberty for a period of more than one year or by a more severe penalty." Article 2(3), (3), (4) and (5) contain further provisions particularizing the designation of an "extraditable offense." I need not consider them further because Manea and the Government agree that Manea's charged conduct in obtaining loans from Romanian banks, recounted in Judge Margolis's opinion at 2018 WL 1110252, at *15-22, if committed, give rise to "extraditable offenses" under the Treaty.

Article 6 provides:

6

Extradition may be denied if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State. Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requesting State.

Article 8 of the Treaty specifies the "Required Documents" which a foreign country must submit in support of a request that the United States extradite an individual. Article 8(2) and 8(3) specify documents respecting the identity of the person sought for extradition, the nature of the conduct in question, and particular documents if the person "is charged with an offense." Article 8(4) requires the submission of additional documents if the request is for "a person who has been found guilty or convicted of the offense for which extradition is sought." Article 8(4)(d) provides that "in the case of a person who has been found guilty or convicted *in absentia*, the documents required by paragraph 3 of this Article and information regarding the circumstances under which the person was absent from the proceedings" must be submitted.

### III.  HABEAS REVIEW OF EXTRADITION ORDERS

Manea challenges and seeks to avoid the extradition order issued by Magistrate Judge Margolis. Her vehicle for doing so is the present petition for habeas corpus addressed to this Court. "Because extradition orders are regarded as preliminary determinations, and not 'final decisions' appealable as of right under 28 U.S.C. § 1291, they may only be reviewed by a petition for a writ of habeas corpus under 28 U.S.C. § 2241." *Skaftouros v. United States*, 667 F.3d 144, 157 (2d Cir. 2011) (citation omitted).

That is the sole remedy available to an individual like Manea whose extradition has been ordered. If a foreign government's request for extradition has been denied by a judicial officer sitting as extradition magistrate, the government's only recourse is to file the same request before

a different judicial officer and hope for a more favorable outcome.  In *United States v. Doherty*, 786

F.2d 491, 496 (2d Cir. 1986), Judge Friendly said:

> Under present Federal law, there is no direct appeal from a judicial officer's finding in an extradition hearing. A person found extraditable may only seek collateral review of the finding, usually through an application for a writ of habeas corpus. The foreign government that is dissatisfied with the results of the hearing must institute a new request for extradition.

It is a striking feature of extradition practice that a dissatisfied government is entitled "to try

again before the authority, which would in no way be bound by the previous decision." *Doherty*, 786

F.2d at 503.[3]  *See also Ahmad v. Wigen*, 910 F.2d 1063, 1065 (2d Cir. 1990) ("An extraditee's sole

remedy from an adverse decision is to seek a writ of habeas corpus; the Government's sole remedy

is to file a new complaint.  In considering the Government's second request, Judge Korman was not

bound in any way by Magistrate Caden's prior decision.") (citing *Doherty,* 786 F.2d at 503).

In this District, where there are fourteen district judges and six magistrate judges,

conceptually Romania, if initially disappointed, could have filed nineteen additional requests, one

by one, in search of a judicial officer who would issue an extradition order, a tedious process

unnecessary in this case because Magistrate Judge Margolis issued the order certifying Manea for

extradition on Romania's first try.  Thus the case comes before this Court on Manea's petition for

habeas corpus.

---

[3]  In *Doherty,* the Government, seeking on behalf of the United Kingdom the extradition of an IRA fugitive, had its extradition request denied by District Judge Sprizzo and, instead of submitting the request to another district judge, commenced a separate action under the Declaratory Judgment Act, in an effort, Judge Friendly noted, to obtain "a declaration that will bind another extradition judge in a proceeding not yet commenced." 786 F.2d at 502. The Second Circuit affirmed the district court's dismissal of the Government action on the ground that the issue was not susceptible to declaratory judgment.

The Second Circuit's most recent decision in the law of extradition is *Bisram v. United States*, No. 18-3437-pr, 2019 WL 2932755 (2d Cir. July 9, 2019). Guyana requested the extradition from New York of Bisram, a dual citizen of the United States and Guyana, to face charges for a murder he allegedly committed in Guyana. A federal magistrate judge issued a Certificate of Extraditability, "certifying to the Secretary of State that there was probable cause to believe that Bisram committed the charged murder and authorizing the Secretary's extradition of Bisram to Guyana." 2019 WL 2932755, at *1. Bisram filed a petition for a writ of habeas corpus in the Eastern District of New York, which denied the petition, concurring in the magistrate judge's conclusion "that there was a 'reasonable ground' to believe that Bisram committed the murder as charged." *Id*. The Second Circuit, affirming that denial of habeas relief, said:

> On collateral review of an extradition order, the district court may only "inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was a reasonable ground to believe the accused guilty."

*Id*., at *2 (quoting *Skaftourous*, 667 F.3d at 157). The Second Circuit in *Bisram* phrased that final consideration as "the extraditing country's threshold showing of *probable cause*" (emphasis added), and held: "At a minimum, we cannot say that the district court erred in concluding that the evidence submitted by Guyana surpassed the minimal threshold of 'any evidence warranting the finding that there was a reasonable ground to believe the accused guilty.'" *Id*., at *3. As stated by the Second Circuit in *Austin v. Healey*, 5 F.3d 598 (2d Cir. 1993):

> [O]n appeal from the denial of habeas corpus in extradition proceedings, the scope of our review is quite limited. We consider only: (1) whether the judicial officer who conducted the extradition proceedings had jurisdiction; (2) whether the offense charged is extraditable under the terms of the treaty; and (3) whether there was

> sufficient evidence to support the finding of *probable cause* to extradite.

5 F.3d at 600 (emphasis added) (citations omitted).

Thus the requesting country's burden of proof in obtaining extradition is the familiar standard of probable cause. The Second Circuit expanded on that principle in *Skaftouros*:

> Orders of extradition are *sui generis*. They embody no judgment on the guilt or innocence of the accused but serve only to insure that his culpability will be determined in another and, in this instance, a foreign forum. In this way, the judicial officer's function is much the same as his accustomed task of determining if there is probable cause to hold a defendant to answer for the commission of an offense. As we have stressed in the past, [w]hat is at issue in the proceeding . . . is not punishability but *prosecutability*.

667 F.3d at 155 (emphasis in original) (citations and internal quotation marks omitted).

In addition, the Second Circuit made it plain, in another case of a habeas petition challenging an extradition order, that "[i]n attacking the weight and competence of the evidence" the requesting country submits to demonstrate probable cause, the targeted extraditee "labors under two sets of difficulties." *Shapiro v. Ferrandina*, 478 F.2d 894, 900 (2d Cir. 1973) (Friendly, *J.*). *Shapiro* continues:

> First, the function of the extraditing magistrate is not to decide guilt or innocence but merely to determine whether there is competent legal evidence which would justify his apprehension and commitment for trial if the crime had been committed in that state. Thus, evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's hearing.

*Id.* at 900-01 (citations, internal quotation marks and ellipses omitted).[4] In *Bisram*, the Second

---

[4] The second "difficulty" referred to by *Shapiro,* previously noted in the text of this Ruling, is that "the magistrate's decision is not itself appealable, and review of his decision generally must be pursued by writ of habeas corpus, which, at least in theory, is more restricted than review on

Circuit further cited and quoted *Shapiro* for the proposition that "statements [that] would in no way explain . . . or . . . obliterate the government's evidence, but would only pose a conflict of credibility . . . should properly await trial in the [country seeking extradition]." *Bisram*, 2019 WL 2932755, at *2 (quoting *Shapiro*, 478 F.2d at 905). *See also Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984) ("In the exercise of the extraditing judge's discretion, a fugitive may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country.") (cited and quoted in *Bisram*).

## IV.    DISCUSSION

In resisting extradition during the proceedings before Magistrate Judge Margolis, Manea made a number of unsuccessful contentions which are not reiterated in this habeas petition. I say nothing about those, and turn instead to the claims Manea asserts in support of the petition. There are three: (1) there is no showing of probable cause, of the sort required to justify extradition; (2) extradition is precluded because the underlying prosecution is time-barred; and (3) extradition should be denied because of humanitarian and torture-risk concerns. I consider these contentions in order.

### A.    Probable Cause

The core of Romania's several claims against Manea is bank fraud. The Romanian court and prosecutorial documents supporting the extradition request describe a number of instances of a company owned by Manea borrowing significant sums from Romanian banks, ostensibly for business purposes, where the monies borrowed were used instead for unrelated personal needs and the loans were never repaid. Manea obtained these loans, Romania charges, by a number of fraudulent means, including forgery.

---

appeal." 478 F.2d at 901 (citations omitted).

As Manea acknowledges in her main brief on this petition, Doc. 9 at 22, Magistrate Judge Margolis found that this alleged conduct "constituted offenses in both countries," Romania and the United States, thereby qualifying Manea's actions as "an extraditable offense" under Article 2 (1) of the Treaty. Manea's habeas petition does not challenge that finding. Her principal present contention is that the laws of both countries specify intent as a necessary element of fraud, and the supporting documents fail entirely to allege Manea's intent, an omission fatal to a showing of probable cause in aid of extradition. Manea's brief argues:

> As is typical with American fraud statutes, the ones cited all involve a mens rea of intent to deceive or defraud. . . .
>
> Similarly, the Romanian statutes cited by the Magistrate Court in its order almost all have an intent element. . . .
>
> And yet, the evidence of probable cause, accepted from the findings of the Romanian court, does not establish probable cause for the violation of any of those statutes – state, federal or Romanian – because it does not establish the necessary element to defraud. The Magistrate Judge's order quotes extensively from the findings of the Bucharest court – those findings take up 16 of the 62 pages in the order. They contain numerous examples of documentation submitted by Ms. Manea in regard to various loans, yet those findings, broken down into six categories, contain no evidence of Ms. Manea's alleged state of mind. As such, they have not demonstrated probable cause with respect to the offenses that have intent to deceive as an element.
>
> Without any showing of probable cause of the necessary element of intent to deceive, the material from the Bucharest court is not sufficient to show probable cause that she committed the analogous American crimes that are offered as meeting the dual criminality standard.

Doc. 9, at 23-24. The proffered supporting documents are insufficient in that regard, Manea's argument concludes, because "the demonstration of mens rea, as opposed to the evidence of specific factual transactions, is conclusory." *Id.*, at 24.

While the argument for Manea on this point is forcefully expressed, I find myself unable to accept it. The contention depends on the premise that Romania's evidence concerning Manea's criminal intent is insufficient because it is "conclusory," that is to say, there is no direct or explicit evidence that Manea intended to defraud the banks who loaned Manea's companies monies that were never repaid – in the vernacular, no evidentiary "smoking gun" on the element. That absence of evidence on the point may be acknowledged, but it avails Manea nothing because American criminal law does not require such evidence. In *United States v. Heras*, 609 F.3d 101, 106 (2d Cir. 2010), which considered the sufficiency of evidence convicting an individual of joining a conspiracy with the intent to commit its criminal objective, the Second Circuit said: "Proof of such intent need not have been direct. The law has long recognized that criminal intent may be proved by circumstantial evidence alone," a principle of broad application. "[A]s a general rule most evidence of intent is circumstantial." *United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998).

That principle controls the case at bar. The "analogous American crime" that Romania "offered as meeting the dual criminality standard" is bank fraud, a form of conspiracy falling within the general rule that "most evidence of intent is circumstantial." The Second Circuit's articulation of that principle in cases affirming convictions after trial applies *a fortiori* to Manea's extradition case, where the Government need only demonstrate probable cause rather than prove guilt. Romania is not precluded by American law from making that showing of probable cause by means of circumstantial evidence, which under the cited cases Manea cannot be heard to dismiss as "conclusory."

In the case at bar, there is a considerable amount of circumstantial evidence from which a reasonable inference of Manea's criminal intent in her companies' dealings with Romanian banks

could be drawn. That evidence includes bank records, company records, and the statements of eight witnesses. Those documents, discovered during or generated by the Romanian criminal court proceedings, were duly authenticated by Romania and submitted in support of Romania's request to the United States Secretary of State for the extradition of Manea. The documents were made exhibits during the extradition proceeding before Magistrate Judge Margolis, and are also before this Court as part of the record in this habeas proceeding. Judge Margolis's summary and description of the contents of these documents, 2018 WL 1110252, at *14-25, are entirely accurate, and I accept them as my own. In consequence, the evidence contained in these documents constitutes a part of the record in this habeas proceeding. This evidence is probative of the circumstances attendant upon Manea's dealings on behalf of her companies with Romanian banks.

Manea does not deny that her companies borrowed considerable sums from the Romanian banks and did not repay them. The full panoply of circumstances surrounding those loans, for the most part undisputed, are sufficient to support a permissible inference of Manea's fraudulent intent, based upon circumstantial evidence admissible for that purpose.

During the extradition hearing before the Magistrate Judge, Manea made a number of objections to or comments upon this evidence which Judge Margolis overruled or declined to follow. On this habeas petition, Manea does not press all those contentions. Manea's argument on the probable cause issue focuses solely on the question of her intent while dealing with the banks – a dead aim revealed by this passage from her main brief, which after describing a number of banking documents goes on to say:

> In each of these excerpts, the falsity of the relevant documents is explained – items pledged for collateral that were already pledged to others, descriptions of the purpose of loans that, once dispersed, were

not carried through, etc. But they lack any specific evidence that Ms. Manea had a guilty intent. Indeed, they *conclude* the presence of her intent. That is, they draw an inference from the facts presented to reach a legal conclusion.

Doc. 9, at 22-23 (emphasis in original). The problem with Manea's analysis is that the drawing of an inference from circumstantial evidence that a fact exists for which there is no specific evidence is precisely the form of proof which the Second Circuit routinely approves. [5]

The function I must perform as a judicial officer asked on a habeas corpus petition to allow or reject an extradition order is described in *Collins v. Loisel*, 259 U.S. 309 (1922), where Collins challenged by petition for habeas corpus a district court order extraditing him from Louisiana to India on charges of obtaining money under false pretenses in that country. [6] The extradition request, made by the British government pursuant to an extradition treaty between the United States and Great Britain, was supported by affidavits and evidence generated before an Indian court. Collins contended at the habeas hearing that the extradition order made during the extradition hearing was invalid because "Collins was not permitted to introduce evidence in his own behalf." 259 U.S. at 315. The Court rejected that argument:

---

[5] As the cited cases hold, the nature and effect of circumstantial evidence are well established. *Black's Law Dictionary* (10th ed. 2014) at 674 defines "circumstanital evidence" as "[e]vidence based on *inference* and not on personal knowledge or observation." (emphasis added). *Black* quotes the definition of circumstantial evidence in Burrill, *A Treatise on the Nature, Principles and Rules of Circumstantial Evidence 4* (1868) as "that which is applied to the principal fact, indirectly, or through the medium of other facts, by establishing certain circumstances or minor facts, already described as evidentiary, from which the principal fact is extracted and gathered by a process of *special inference*." (emphasis added). In the present case, Manea's guilty intent is the principal fact Romania infers from the circumstantial evidence.

[6] The request for extradition was made pursuant to an extradition treaty between the United States and Great Britain. The full particulars of the case are stated in an earlier Supreme Court opinion, 252 U.S. 364 (1920).

Collins was allowed to testify, and it was clearly the purpose of the committing magistrate to permit him to testify fully, to things which might have explained ambiguities or doubtful elements in the prima facie case made against him. In other words, he was permitted to introduce evidence *bearing upon the issue of probable cause.* The evidence excluded related strictly to the defense. It is clear that the mere wrongful exclusion of specific pieces of evidence, however important, does not render the detention illegal. The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.

259 U.S. at 315-16 (emphasis added) (citations omitted).

The Supreme Court's reasoning in *Collins* foreshadows the Second Circuit's previously noted pronouncement in *Skaftouros* that when a judicial officer considers whether the probable cause requisite for an extradition order is shown, "what is at issue in the proceeding is not punishability but *prosecutability*." 667 F.3d at 155 (emphasis in original). In *Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir. 1990), the Second Circuit cited *Collins* for the proposition that the district court's "function was to determine whether there was competent evidence to justify certifying Ahmad for extradition, not to predict that an Israeli court would convict him," and added that "[i]f the evidence would support a reasonable belief that Ahmad was guilty of the crime charged, it sufficed."

Having given this issue careful independent consideration, and bound by the authorities cited *supra*, I conclude without difficulty that the requisite probable cause has been shown in this case to justify Manea's extradition to Romania on the charges in question.

## B. Time Bar

Manea contends that "Article 6 of the Extradition Treaty forbids extradition, because prosecution of the offense is barred by lapse of time under the laws of Romania." Doc. 9, at 25. Article 6 of the Treaty provides: "Extradition may be denied if prosecution of the offense or

execution of the penalty is barred by lapse of time under the law of the Requesting State." Article 6 continues: "Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State."

The Government responds that the word "may" in the first sentence means that the denial of extradition on the basis of time bar is discretionary rather than mandatory; and "[d]iscretionary exceptions to extradition, including the lapse of time provision set forth in Article 6, are reserved for the Secretary of State's consideration for making the discretionary decision of whether to surrender the fugitive to the country requesting extradition." Gov't Opp. Brief [Doc. 10], at 29-30. It follows, the argument concludes, that Manea's "statute of limitations argument is not reviewable in this habeas proceeding but, rather, should be directed to the Secretary of State." *Id.,* at 31.

During the extradition proceeding before the Magistrate Judge, the parties briefed an additional issue: whether the Romanian statute of limitations had in fact run. Manea argued that it had, and supported the argument with the opinion of Romanian attorney Dianu, whose affidavit opined that "the charges against the defendant are prescribed and the claims of the Romanian authorities to extradite the defendant are barred by the statute of limitation imposed by the Romanian legislation." *Matter of Extradition of Manea*, 2018 WL 1110252, at *10. That ruling continued by saying: "Attorney Dianu's conclusion, however, contradicts Romania's explanation of the law, which is that '[t]he relevant action is the filing of criminal charges, and not the filing of the extradition request.'" *Id.,* at *10. Moreover, under the Romanian statutes the prescriptive period had been tolled and had not run out. *Id.,* at *11. Judge Margolis resolved that question in Romania's favor and declined to deny extradition on the basis of time bar. She did not reach or discuss the issue of whether, under the particular wording, the effect of lapse of time upon extradition can be

considered by a court, or is instead solely for the consideration of the Secretary of State.

In this habeas proceeding, two questions are presented:

(1)  Accepting, as Manea does, that Article 6's power to deny extradition because of lapse of time is discretionary, is that discretion vested solely in the Secretary of State, or is it shared by this habeas court?[7]  The latter construction Manea espouses in her reply brief at 9, which contends: "[T]he assertion by the representative of the State Department that the Treaty vests that power only in the Executive Branch is not determinative," and continues:  "If there was ever a case for this Court to exercise *its permissive authority* to deny extradition on the statute of limitations ground, it is this one." Doc. 11, at 9 (emphasis added).

(2) If Article 6 discretion is vested solely in the Secretary of State, and there is a dispute between the parties as to whether the Romanian statute of limitations has in fact run, who resolves that dispute  – the Secretary, or the habeas court?

Time bar provisions frequently appear in extradition treaties.  They take different forms.  In *Skaftouros v. United States*, 667 F.3d 144 (2d Cir. 2011), the treaty between the United States and Greece explicitly prohibited extradition if the statute of limitations in either country for the subject offense had expired; in that circumstance, the treaty provided, a "fugitive criminal shall not be surrendered." 667 F.3d at 149.  In *Patterson v. Wagner*, 785 F.3d 1277 (9th Cir. 2015), the treaty between the United States and South Korea provided that if the individual could not be prosecuted for a crime in the United States because the relevant *American* statute of limitations had expired, extradition to South Korea for that crime "may be denied."  In the case at bar, the treaty between the

---

[7]  "Ms. Manea does not contest that the [statute of] limitations clause is permissive, not mandatory."  Reply Brief [Doc. 11], at 9.

United States and Romania provides that if the relevant *Romanian* statute of limitations has expired, extradition to Romania for that crime "may be denied." *See* Article 6.

In *Patterson*, the Ninth Circuit undertook to answer the first question posed above when it held:

> Taken as a whole, the extra-textual evidence reinforces the natural reading of Article 6 [of the treaty]. Under that reading, the Secretary of State may choose, in his or her discretion, whether to grant or deny extradition in a case where the statute of limitations in the United States has expired. *Federal courts thus have no authority* under Article 6 to dictate to the Secretary of State what he or she must do in such a case.

785 F.3d at 1283 (emphasis added). This reasoning applies with equal force to a case like the instant one, where the treaty provides extradition "may be denied" when the Requesting State's statute of limitations has expired. *Patterson* holds that a treaty, thus worded, vests sole discretion to deny or grant extradition in the Secretary of State, and a federal habeas court has no legitimate office to perform in the exercise of that discretion. Manea cites no authority for her proposition that the treaty's phrase "may be denied" confers a joint discretionary power upon a habeas court in an extradition case turning upon a statute of limitations. No Supreme Court or Second Circuit case reaches that conclusion. While I am not bound by the Ninth Circuit's holding in *Patterson,* its reasoning is persuasive. I conclude in this case that *if* the Romanian statute of limitations has in fact run with respect to the crimes charged against Manea, the discretionary decision whether or not to extradite Manea to Romania is vested by the extradition treaty solely in the United States Secretary of State. This habeas court has neither the jurisdiction nor the authority to play any part in how the Secretary should exercise that discretion.

This brings us to the second posed question. The parties dispute whether or not the

19

Romanian statute of limitations has run. Does the Secretary of State decide that issue alone, as part of his exercise of Article 6 discretion? Or does the habeas court decide the issue before relinquishing the case to the Secretary? I am not aware of any case that squarely addresses that question.

I think the proper course is to have the Secretary decide this threshold question as part of the Secretary's exercise of discretion in deciding whether to extradite an individual to answer for a crime in a Requesting State where the statute of limitations has run. It is a matter of practical common sense. Manea would ask the Secretary for a discretionary decision to deny extradition because Romania's limitations statute has run. The Secretary's sensible first step, one would think, would be to make sure that the Romanian statute really *has* run. Romania contends it has not. Manea and Romania cannot both be right. For there to be any extradition discretion to exercise, the Secretary must decide Manea is right. That decision requires an analysis of Romanian limitations law. The Secretary is not without recourse to perform it. Manea says dismissively in her reply brief that "there is no indication that the State Department has any particular insight into the operation of Romanian law." Doc. 11, at 9. Nor, one supposes, does the typical United States district judge. The Secretary has the benefit of being counseled by a government officer whose impressive title is "The Legal Adviser for the Department of State" – a position of considerable consequence.[8]

The record in the case at bar includes declarations by two individuals who identify themselves as "an Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C." One of these, Tom Heinemann, swore to a declaration [Doc. 10-1] whose

---

[8] Some years ago, a District Judge of the Southern District of New York resigned that office to become The Legal Adviser to the Department of State. Although he did not say so publicly, I think it likely that the former judge regarded this as a step up in life: a proposition that is at least arguable, if nothing more.

discussion of the time bar provision in the Treaty with Romania contains this passage:

> Article 6, as reflected by its permissive language, reserves consideration of whether to deny extradition on the grounds that an offense or the execution of a penalty is time-barred, pursuant to the laws of the Requesting State, to the Secretary of State (or his delegates) when making the discretionary decision of whether to surrender a fugitive to the Requesting State. Therefore, the Department of State does not consider Article 6 of the Treaty to be a basis for a court to deny certification of a fugitive's case for extradition.

Implicit in this declaration is the concept that the Secretary's consideration of extradition denial on the ground of time bar necessarily includes the Secretary's preliminary determination that the offense *is* time-barred by the Requesting State's laws. It is fair to assume that if Manea's case reached that stage, her attorney could attempt to persuade the Secretary that, contrary to Romania's contention, the charge against Manea is in fact time-barred and extradition should accordingly be denied. In resolving that dispute, the Secretary would have the benefit of advice by The Legal Adviser to the Department and the ranks of Assistant Legal Advisers.

I could undertake to decide the question in this habeas proceeding, as Magistrate Judge Margolis did in the extradition proceeding, but I do not think it would be appropriate for a habeas court to do so. If thereafter the case reaches the Secretary for consideration of Article 6 of the Treaty, the Secretary might not agree with the court's interpretation of Romanian law, and it is not clear that the Secretary would be bound to follow it. The better course would be for the Secretary to consider all aspects of the time-bar extradition question, including this one. That conclusion is consistent with the Second Circuit's cautionary note in *Skaftouros*, 667 F.3d at 156: "it has long been recognized that an extradition judge should avoid making determinations regarding foreign law." I conclude that the question of time bar does not furnish a basis for habeas corpus relief for Manea

21

in her effort to avoid extradition.

## C. Due Process and CAT Grounds

Manea also contends that her extradition "violates the Due Process Clause of the Constitution and the Convention Against Torture." Doc. 9, at 5. The brief's caption at Part V. asks this habeas Court for an order which would "deny extradition on due process and CAT grounds." *Id.*, at 30.

The Government, while denying that the record establishes such violations, also contends that in any event Manea's criticisms allege deprivations of humanitarian rights which, under the statutory scheme for extradition cases, fall within the exclusive purview of the Secretary of State in the Secretary's exercise of discretionary power to grant or deny the extradition request. It follows, the Government concludes, that a court has neither jurisdiction nor authority to consider humanitarian claims which an individual asserts as a bar to extradition, either during an extradition hearing or in support of a habeas petition.

These contrasting contentions require the Court to consider the existence and extent of its authority to base habeas relief for Manea upon her constitutional due process and international Convention claims.

The "Convention Against Torture" (referred to in the briefs and this Ruling as "CAT") is the "United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment," which was "opened for signature" on December 10, 1984. *Pierre v. Gonzales*, 502 F.3d 109, 114 (2d Cir. 2007). The CAT "is a treaty signed and ratified by the United States," and "entered into force as to the United States November 20, 1994." *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 955 and 955 n. 1 (9th Cir. 2012). "The CAT . . . is non-self-executing. Congress, however, has implemented the treaty by statute as part of the Foreign Affairs Reform and

Restructuring Act of 1998." *Id.* at 956. The Second Circuit's opinion in *Pierre* is to the same effect: "The CAT is not self-executing; by its own force, it confers no judicially enforceable right on individuals. To implement the CAT, Congress amended the immigration laws with the Foreign Affairs and Restructuring Act of 1998." 502 F.3d at 114.

Article 3 (1) of the CAT provides: "No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Article 1 (1) defines "torture": "For the purposes of this Convention, torture means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" for specified objectives "by or at the instigation or with the consent or acquiescence of a public official."

Article 16 (1) of the CAT provides: "Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in Article 1, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official." Article 16 (1) further provides that specific preventive or prophylactic obligations contained in Articles 10, 11, 12 and 13 "shall apply with the substitution for references to torture or references to other forms of cruel, inhuman or degrading treatment or punishment."

The United States' ratification of CAT was accompanied by two reservations included in the ratification resolution: "The term 'cruel, inhuman or degrading treatment or punishment' means the cruel, unusual and inhumane treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States," Res. I (1), and "the United States understands that in order to constitute torture, an act must be specifically intended to inflict severe

physical or mental pain and suffering and that the mental pain or suffering refers to  prolonged mental harm" from one of several specified causes, Res. II (1)(a).

The Second Circuit said in *Pierre* that "the scope of an individual's entitlement to CAT relief, is therefore governed by the text of the CAT *subject to* the terms of the Senate ratification resolution," 502 F.3d at 115, and, one must add, the text and regulations promulgated under the 1998 Foreign Affairs Act which implemented the Convention into domestic law.

The question presented by this case is whether United States law, derived from the CAT, constitutional due process, or the cumulative effect of these two sources, provides Manea with a basis for habeas relief from Romania's effort to extradite her.

Manea's challenges to extradition based on constitutional due process and CAT grounds relate to (1) legal proceedings that occurred or will take place in Romania, and (2) the conditions of incarceration in Romania.  I consider those two grounds in order.

Manea's first theory is that a violation of her due process right is demonstrated by the cumulative effect of several aspects of the Romanian prosecution against her in Romania. Specifically, Manea claims she did not receive adequate notice of the charges against her; she was not represented by counsel during her *in absentia* trial on those charges; her sentence was illegal because it was inaccurately calculated by the Romanian judge; she was not given notice of her right to appeal or  provided with counsel for a possible appeal; she is not guaranteed the right to a retrial; and she has been prejudiced by Romania's delay in requesting extradition.

These assertions, while pressed vigorously, when viewed separately or together do not establish a violation of Manea's due process rights secured by the United States Constitution.  This aspect of the case is governed by the Supreme Court's seminal decision in *Neely v. Henkel*, 180 U.S.

109 (1901).  Neely, an American citizen, challenged by writ of habeas corpus a request that he be

extradited to Cuba, regarded by the Court as a "foreign territory" which "cannot be regarded, in any

constitutional, legal, or international sense, a part of the territory of the United States."  180 U.S. at

119.[9]  Neely had committed in Cuba the charged acts for which extradition was sought.  His habeas

petition contended that the statute establishing the post-war status of Cuba

> is unconstitutional and void in that it does not secure to the accused,
> when surrendered to a foreign country for trial in its tribunals, all of
> the rights, privileges, and immunities that are guaranteed by the
> Constitution to persons charged with the commission in this country
> of crimes against the United States.  Allusion is here made to the
> provisions of the Federal Constitution relating to the writ of habeas
> corpus, bills of attainder, *ex post facto* laws, trial by jury for crimes,
> and generally to the fundamental guaranties of life, liberty and
> property.

180 U.S. at 122.

The Supreme Court briskly rejected the habeas petitioner's broadly based appeal to a

collection of federal "fundamental guaranties":

> The answer to this suggestion is that those provisions have no relation
> to crimes committed without the jurisdiction of the United States
> against the laws of a foreign country. . . . When an American citizen
> commits a crime in a foreign country, he cannot complain if required
> to submit to such modes of trial and to such punishment as the laws
> of that country may prescribe for its own people, unless a different
> mode be provided for by treaty stipulations between that country and
> the United States.

*Id*.  The *Neely* opinion concludes: "The court below having found there was probable cause to

believe the appellant guilty of the offenses charged, the order for his extradition was proper, and no

---

[9]  Cuba had been part of Spain until the treaty ending the Spanish -American war terminated
Spain's claim to sovereignty over Cuba.  During the time pertinent to the case, the United States was
installed as occupying power, while "the civil and criminal code which prevailed prior to the
relinquishment of Spanish sovereignty will remain in force." 109 U.S. at 118.

ground existed for his discharge on habeas corpus." *Id.* at 125.[10]

The Court's reasoning in *Neely* applies *a fortiori* to Manea, who was a Romanian, not an American citizen, when the charged conduct was committed in Romania. Manea achieved naturalized American citizenship *after* arriving in this country, but that has no effect upon the Supreme Court's holding in *Neely,* which describes the situation confronting an American citizen who commits a crime in a foreign country. The assortment of American rules and guaranties Manea relies upon in resisting extradition to Romania is reminiscent of the collection unsuccessfully invoked by Neely in resisting extradition to Cuba. Manea fares no better.

*Neely* retains its vitality in the law of extradition. In *Munaf v. Geren*, 553 U.S. 674, 697 (2008), the Supreme Court cited *Neely* for the proposition that "habeas corpus was not available to defeat the criminal jurisdiction of a foreign sovereign, even when application of that sovereign's law would allegedly violate the Constitution." *See also Murphy v. United States*, 199 F.3d 599, 603 (2d Cir. 1999) (citing and quoting *Neely* in denying habeas corpus challenge to extradition to Canada).

Manea's second theory is based upon the prevailing conditions of punishment and imprisonment in Romania. Manea likens those conditions to torture. In *Neely* the Supreme Court did not consider the condition of prisons in the requesting foreign country as a possible bar to extradition. The Court addressed that issue, apparently for the first time, in *Munaf v. Geren*.

---

[10] *Fernandez v. Phillips*, 268 U.S. 311 (1925), another often-cited Supreme Court case, is to the same effect. The fugitive challenged by writ of habeas corpus a magistrate's judgment remanding him for extradition to Mexico. The Court rejected his appeal: "[H]abeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty. . . . We are of opinion that probable cause to believe the defendant guilty was shown by competent evidence and that the judgment remanding the appellant must be affirmed." 268 U.S. at 312, 314.

*Munaf*, decided in 2008, is the Supreme Court's most recent opinion in the complex and sensitive area of habeas corpus relief sought by individuals resisting a transfer from the United States to a foreign nation for criminal prosecution there. The official Report recites that Chief Justice Roberts "delivered the opinion for a unanimous Court," and Justice Souter "filed a concurring opinion, in which Justices Ginsburg and Breyer joined." 553 U.S. at 679. For reasons that will appear, in order to fully comprehend the effects of the Court's decision in *Munaf* upon the case at bar, one must analyze with care both Chief Justice Roberts' opinion for the "unanimous Court" and Justice Souter's concurring opinion, subscribed by three Justices.

The habeas petitioners in *Munaf* were American citizens who traveled to Iraq after the fall of the Saddam Hussein regime, allegedly committed hostile acts in Iraq against the new government, and were being detained by American military forces in Iraq "pending investigation and prosecution in Iraqi courts under Iraqi law." 553 U.S. at 680. The American military proposed to transfer petitioners to Iraqi custody and allow them to be tried by Iraqi courts. The two individuals filed habeas corpus petitions in the D.C. district court, seeking to block their transfer from American custody to the Iraqi authorities for trial. In the district court and the D.C. Circuit, one petitioner succeeded and the other failed. The Supreme Court granted certiorari in both cases, consolidated them for argument, and held that neither petitioner was entitled to habeas relief.

While *Munaf* was not an extradition case, the Court's reasoning is fully applicable to extradition. The Court rejected the *Munaf* habeas petitioners' argument that the Due Process Clause "includes a freedom from unlawful transfer that is protected whenever the government seizes a citizen":

> We disagree. Not only have we long recognized that a nation state

reigns sovereign within its own territory, we have twice applied that principle to reject claims that the Constitution precludes the Executive from transferring a prisoner to a foreign country for prosecution in an allegedly unconstitutional trial.

553 U.S. at 696. One of the two applications the Court had in mind was *Neely*, an extradition case, which *Munaf* describes as holding that "habeas corpus was not available to defeat the criminal jurisdiction of a foreign sovereign, even when application of that sovereign's law would allegedly violate the Constitution."[11]

The Court did not end its opinion in *Munaf* at that point. It went on to say:

> Petitioners contend that these general principles are trumped in their cases because their transfer to Iraqi custody is likely to result in torture. Such allegations are of course a matter of serious concern, but in the present context that concern is to be addressed by the political branches, not the Judiciary. . . . Even with respect to claims that detainees would be denied constitutional rights if transferred, we have recognized that it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments.

553 U.S. at 701-02. Again, the Court did not stop there. The *Munaf* opinion further goes on to say:

> The Executive Branch may, of course, decline to surrender a detainee for many reasons, including humanitarian ones. Petitioners here allege only the possibility of mistreatment in a prison facility; this is not a more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway. Indeed, the Solicitor General states that it is the policy of the United States *not* to transfer an individual in circumstances where torture is likely to result. In these cases the United States explains that, although it remains concerned about torture among some sectors of the Iraqi Government, the State Department has determined that the Justice Ministry – the department that would have authority over Munaf and Omar – as well as its prison and detention facilities have "generally met internationally accepted standards for basic prisoner needs." The Solicitor General

---

[11] The other earlier decision *Munaf* cited is *Wilson v. Girard*, 354 U.S. 524 (1957).

explains that such determinations are based on "the Executive's assessment of the foreign country's legal system and the Executive's ability to obtain foreign assurances it considers reliable."

The Judiciary is not suited to second-guess such determinations – determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area. . . . In contrast, the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is.

*Id*. at 702-03.

These passages in the Chief Justice's *Munaf* opinion prompted Justice Souter to file a concurring opinion which Justices Ginsburg and Breyer joined. Justice Souter quotes the Court's holding that "under circumstances such as those presented here, habeas corpus provides petitioners with no relief," and adds: "The Court's opinion makes clear that those circumstances include the following: . . . the State Department has determined that the department that would have authority over Munaf and Omar as well as its prison and detention facilities have generally met internationally accepted standards for basic prisoner needs." 553 U.S. at 707. Justice Souter then says: "Because I consider these circumstances essential to the Court's holding, I join its opinion." *Id*. Having signed this concurring opinion, we may understand that Justices Ginsburg and Breyer share Justice Souter's view of the essential importance of the quoted circumstance to the Court's holding in *Munaf*.

Having recited in his concurring opinion his understanding of *Munaf*'s holding, Justice Souter turns to a case where the record shows that torture is likely. His concurrence says of the Court's opinion in *Munaf*:

The Court accordingly reserves judgment on an "extreme case in

29

which the Executive has determined that a detainee [in United States custody] is likely to be tortured but decides to transfer him anyway." I would add that nothing in today's opinion should be read as foreclosing relief for a citizen of the United States who resists transfer, say, from the American military to a foreign government for prosecution in a case of that sort, and I would extend the caveat to a case in which the probability of torture is well documented, even if the Executive fails to acknowledge it. Although the Court rightly points out that any likelihood of extreme mistreatment at the receiving government's hands is a proper matter for the political branches to consider, if the political branches did favor transfer it would be in order to ask whether substantive due process bars the Government from consigning its own people to torture.

*Id.* at 706. Justice Souter concludes his concurring opinion on this ringing note:

And although the Court points out that habeas is aimed at securing release, not protective detention, habeas would not be the only avenue open to an objecting prisoner; where federally protected rights are threatened, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.

533 U.S. at 707-08 (citation and internal quotation marks omitted).

The quoted passages in the *Munaf* main and concurring opinions resonate in the case at bar because, in direct contrast to the State Department's determination in *Munaf* that Iraq's prison and detention facilities have "generally met internationally accepted standards," the State Department has repeatedly and consistently determined that Romania violates those standards. The briefs for Manea cite and quote a number of State Department Country Reports on Human Rights. The 2013 State Department Report about Romania says: "Prison conditions remained somewhat harsh and *at times* did not meet international standards." (emphasis added). Conditions may have worsened, judging by the State Department's 2015 Report about Romania: "Prison conditions remained harsh and did not meet international standards"; the minimizing phrase "at times" is omitted. The Department's 2017 Report says: "Prison conditions remained harsh and overcrowded and did not

meet international standards.  The abuse of prisoners by authorities and other prisoners reportedly continued to be a problem."  The State Department's 2018 Report repeats those adverse determinations, using the same language.[12]

The record therefore establishes that for six consecutive years, through and including its most recent Report, the United States State Department has determined and reported that Romania's harsh treatment of prisoners places that country outside the boundaries of the law-abiding international community.

The State Department's condemnations of Romanian prison conditions do not use the word "torture," as used in Article 3 of the CAT.  However, in Article 16 the Convention also forbids "other cruel, inhuman, or degrading treatment," which the United States' reservation defines as, *inter alia,* punishment prohibited by the Eighth Amendment.  The State Department reports year after year that imprisonment in Romania "did not meet international standards," which permits the plausible, if not compelling, inference that Romanian prisoners are frequently subjected to treatment an American court would regard as violating both the United States Constitution and the CAT  (which, as a ratified and implemented treaty, also has the force of domestic federal law).  In that regard, the circumstances of this case contrast dramatically with those in *Munaf*, where in denying habeas relief the Court quoted and relied upon the State Department's determination that Iraq's prison and detention facilities have "generally met internationally accepted standards for basic prisoner needs."

The question in the case at bar becomes whether this Court has the jurisdiction and authority to consider a petition by Manea for habeas corpus relief based on the theory, pressed by Manea, that

---

[12]   The State Department Reports in 2013, 2015, and 2017 are cited and quoted in Manea's Main Brief, Doc. 9 at 10.  The 2018 Report was issued subsequently and is accessible on the State Department website.

the United States (acting on behalf of Romania) cannot lawfully consign an American citizen to Romanian conditions of imprisonment which the State Department has repeatedly determined violate international standards. The viability of a habeas corpus claim in that particular circumstance requires further consideration of the manner in which the Supreme Court decided *Munaf v. Geren.*

Full comprehension of the Supreme Court's holdings in *Munaf* requires reading Chief Judge Roberts' unanimous opinion together with Justice Souter's concurring opinion, subscribed by two additional Justices. The concurring opinion characterizes as "essential to the Court's holding" the circumstance that "the State Department has determined" Iraq's prison and detention facilities "have generally met internationally accepted standards," a characterization the Court's opinion does not question and accordingly accepts *sub silentio*. It follows, in the concurrence's view, that "the Court accordingly reserves judgment on an 'extreme case in which the Executive has determined that a detainee [in United States custody] is likely to be tortured but decides to transfer him anyway.'" The concurring Justices leave little doubt about how they would vote if a later day presents that extreme case: "I would add," Justice Souter writes, "that nothing in today's opinion should be read as foreclosing relief for a citizen of the United States who resists transfer, say, from the American military to a foreign government for prosecution in a case of that sort, and I would extend the caveat to a case in which the probability of torture is well documented, even if the Executive fails to acknowledge it." Nothing in the Court's *Munaf* opinion challenges the accuracy of that reading.

In the sort of "extreme case" contemplated by Justice Souter's concurring opinion, a writ of habeas corpus would be a vehicle for a citizen's relief. I read the Court and concurring opinions in *Munaf* together as suggesting, explicitly or by necessary implication, that this Court, sitting as a habeas court, has jurisdiction to consider whether Manea's extradition to Romania should be barred

because its implementation would violate the United States Constitution or the CAT.[13] On this view, the habeas court would not be not precluded from consideration of Manea's claim by earlier Supreme Court decisions like *Neely* and *Fernandez*. Were it otherwise – if in these circumstances this Court lacked jurisdiction to consider Manea's claim as a ground for habeas relief – then a United States citizen would be without a remedy to prevent a wrongful transfer to a foreign country: a result that could not be reconciled with the manner in which the Supreme Court reached and articulated the opinions in *Munaf.*

Circuit court decisions following and citing *Munaf v. Geren* focus upon the Supreme Court's cautionary holding in *Munaf* that the Secretary of State is better suited than the judiciary to consider foreign policy issues in determining whether to surrender a person to a foreign government. *See, e.g., Trinidad y Garcia v. Thomas*, 683 F.3d 952 (9th Cir. 2012) (*en banc*); *Venckiene v. United States*, 929 F.3d 843 (9th Cir. 2019).

*Trinidad y Garcia* was an extradition case which sharply divided the Ninth Circuit sitting *en banc*. The extradition of Trinidad y Garcia, the individual in question, from the United States to the Phillipines was sought to face criminal charges there. Trinidad y Garcia resisted on the grounds that his extradition would violate his rights under the CAT and the Fifth Amendment's Due Process Clause. According to Circuit Judge Pregerson's opinion concurring and dissenting in part, 683 F.3d at 1004, this transpired:

> Trinidad y Garcia presented his CAT claim to the Secretary of

_____

[13] I say "suggesting" rather than "holding" because the Supreme Court *held* in *Munaf* that the judiciary should not second guess the Executive's determination that Iraqi prison and detention facilities *met* international standards. As Justice Souter notes in his concurrence, the Court reserved judgment on a case like the one at bar, where the Executive repeatedly determined that the requesting state *failed to meet* international standards.

State. But despite this evidence, Secretary Condoleeza Rice authorized a warrant to surrender Trinidad y Garcia for extradition on September 12, 2008. Trinidad immediately filed a request to stay the extradition pending the resolution of a habeas corpus petition, which the district court granted. On November 24, 2009, Trinidad filed a writ of habeas corpus under 28 U.S.C. § 2241, alleging that he was being unlawfully detained pending extradition under the Secretary of State's surrender warrant because he was denied procedural due process, and because his extradition will violate CAT and federal law, and deny him his substantive due process rights. The Secretary of State refused to provide the district court with any evidence for it to review the Secretary's decision to surrender Trinidad y Garcia for extradition. Because of Trinidad y Garcia's compelling unrebutted evidence of the likelihood of torture, the district court granted Trinidad y Garcia's habeas petition.

The majority of the Ninth Circuit *en banc* court vacated the district court's grant of habeas relief. Its *per curiam* opinion, 683 F.3d at 955-57, concludes that the district court had jurisdiction over Trinidad y Garcia's petition: "The writ of habeas corpus historically provides a remedy to non-citizens challenging executive detention." *Id.* at 956. The majority also faulted the Secretary of State for failing to adequately respond to the district court about the habeas petition. The *per curiam* opinion reasoned that "[t]he CAT and its implementing regulations are binding domestic law, which means that the Secretary of State *must* make a torture determination before surrendering an extraditee who makes a CAT claim"; under the pertinent regulation, "the Secretary must consider an extraditee's torture claim and find it not 'more likely than not' that the extraditee will face torture before extradition can occur. An extraditee thus possesses a narrow liberty interest: that the Secretary comply with her statutory and regulatory obligations." *Id*. at 956-57. The problem for the *en banc* majority was that "[t]he record before us provides no evidence that the Secretary has complied with the procedure in Trinidad y Garcia's case"; the Secretary contented herself with "a generic declaration outlining the basics of how extradition operates at the Department and

acknowledging the Department's obligations under the aforementioned treaty, statute and regulations, but the Department gives no indication that it actually complied with those obligations in this case." *Id.* at 957. That circumstance dissatisfied the majority: "In the absence of any evidence that the Secretary has complied with the regulations, we lack sufficient basis in the record to review the district court's order granting Trinidad y Garcia's release." *Id.*

The majority thereupon remanded the case to the district court, with instructions to the Secretary of State and the district court which provoked the split in the *en banc* Ninth Circuit. The majority's opinion says:

> We remand to the district court so that the Secretary of State may augment the record by providing a declaration that she has complied with her obligations. Counsel for the government represented that the Secretary would provide such a declaration if the court so instructs. We so instruct.
>
> If the district court receives such a declaration, it shall determine whether it has been signed by the Secretary or a senior official properly designated by the Secretary. If so, the court's inquiry shall have reached its end and Trinidad y Garcia's liberty interest shall be fully vindicated. His substantive due process claim is foreclosed by *Munaf v. Geren*, 553 U.S. 674 (2008). The doctrine of separation of powers and the rule of non-inquiry block any inquiry into the substance of the Secretary's declaration.

*Id.*

For the most part, the *en banc* minority concurred with the majority's holdings that habeas jurisdiction existed and the Secretary's initial response to the district court was inadequate. The minority dissents on the final holding: That the Secretary's unadorned declaration of her compliance with the inquiries the law required *the Secretary* to make would preclude any consideration by *the district court* of the merits of an extraditee's habeas corpus claims.

That contrary view is expressed in the opinion of Judge Berzon, dissenting in part, 683 F.3d

984-1002:

> I cannot, however, agree with the majority's ultimate holding that once the Secretary of State (or her delegate) meets the procedural due process requirement by submitting a barebones declaration, courts under no circumstances have authority to conduct *any* substantive review of the Secretary's compliance with federal law. . . . [N]either the Supreme Court's decision in *Munaf* nor the rule of non-inquiry *entirely* forecloses our ability to review the lawfulness of an extradition decision by the Executive.

*Id.* at 984, 986 (emphases in original).

Judge Pregerson, dissenting in part, 683 F.3d 1002-09, makes the same point:

> Because Trinidad y Garcia has made a non-frivolous claim that "there are substantial grounds for believing [he] would be in danger of being subjected to torture" if he is extradited to the Philippines, . . . in violation of the "laws or treaties of the United States," 28 U.S.C. § 2241(c)(3), he has stated a cognizable habeas corpus claim in which he is entitled to meaningful review.
>
> Thus, I disagree with the majority that Trinidad y Garcia's liberty interest will be fully vindicated if the Secretary of State augments the record with a declaration "signed by the Secretary or a senior officer designated by the Secretary" attesting that the Secretary has complied with her regulatory obligations. Supreme Court precedent counsels otherwise: where we have found habeas jurisdiction, our review consists of some authority to assess the sufficiency of the Government's evidence. Because such a bare bones declaration from the Secretary or a senior official properly designated by the Secretary does not allow us to assess the sufficiency of the Government's evidence, I cannot join the majority opinion and therefore dissent. . . .
>
> In reviewing Trinidad's habeas claim and the compelling evidence he submitted, the majority believes all that is required of the State Department is a declaration from the Secretary "or a senior official properly designated by the Secretary" attesting that the Secretary considered Trinidad y Garcia's torture claim and found it not "more likely than not" that he would face torture if returned to the

> Philippines. But such a superficial inquiry in the context of a habeas corpus petition abdicates the critical constitutional duty and authority of the judiciary to protect the liberty rights of the detained by calling the jailer to account.
>
> . . . .
>
> I disagree with the majority that *Munaf v. Geren*, 553 U.S. 674 (2008), and the Rule of Non-Inquiry prevent us from performing our constitutional duty of "inquiring into the substance of the Secretary's decision."

683 F.3d at 1002, 1005-06 (citations, some internal quotation marks, and punctuation omitted).

I am not bound by Ninth Circuit authority, and may accordingly choose between these conflicting majority and minority opinions in *Trinidad y Garcia.* I think that on the question of whether a Secretary of State's decision to extradite a person precludes any inquiry by a habeas court into the lawfulness of that decision, the reasoning of the Ninth Circuit *Trinidad y Garcia* dissenters (which I have quoted only partially) is by far the more persuasive. That reasoning supports the conclusion that, to some degree, judicial review on habeas corpus is available to test a Secretary of State's decision to extradite an individual to a particular foreign country.

Moreover, I agree with these dissenting Ninth Circuit judges that the Supreme Court's decision in *Munaf* does not entirely foreclose a habeas court's review of the lawfulness of a Secretary's extradition order. Indeed, I have concluded in this Ruling, *supra*, that the Roberts and Souter opinions in *Munaf*, read and analyzed together, are careful to preserve judicial review in "extreme cases": a proposition arguably applicable to Manea's case, where a decision by the Secretary to extradite would transfer an American citizen to a foreign country whose criminal detention facilities, the State Department has previously determined, violate international law and, it is more likely than not, would subject Manea to hardships an American court would regard as

unconstitutional.

More recently, the Ninth Circuit appears to have embraced the view expressed by the dissents in *Trinidad y Garcia* and concluded that, at least in principle, a habeas court has jurisdiction to consider whether a Secretary of State's extradition order is contrary to governing domestic law. The case is *Venckiene v. United States*, 929 F.3d 843 (9th Cir. 2019). Lithuania sought extradition of Venckiene from the United States to prosecute her for offenses allegedly committed in Lithuania. A magistrate judge considered the extradition treaty between the United States and Lithuania, conducted a hearing pursuant to § 3184 of the Extradition Act, and certified Venckiene as extraditable. The Secretary of State granted the extradition. Venckiene then filed a petition for a writ of habeas corpus "challenging both the magistrate judge's certification order and the Secretary's decision," and also asking the district court to stay her extradition. 929 F.3d at 848. The district court denied that requested stay and Venckiene appealed. The Ninth Circuit noted: "This appeal challenges only the district judge's denial of Venckiene's request to extend the stay of her extradition, but that challenge necessarily implicates the merits of her habeas petition." *Id*.

During the course of its opinion affirming the district court's denial of a stay, the Ninth Circuit said: "The Secretary of State has sole discretion to determine whether or not extradition should proceed further with the issuance of a warrant of surrender," and "[g]enerally, the Secretary of State's decision is not subject to judicial review." *Id.* at 849 (citations and internal quotation marks omitted). The opinion then utters an immediate caveat:

> This circuit and others, however, have recognized an exception
> through which courts can, at least in theory, consider claims that the
> substantive conduct of the United States in undertaking its decision
> to extradite violates constitutional rights.

*Id.* (citations and internal quotation marks omitted). While the Ninth Circuit's opinion in *Venckiene*, decided just two months ago, referred to *Munaf* as "teaching that the judiciary should refrain from encroaching upon the executive's political and humanitarian decisions regarding foreign justice systems," the Ninth Circuit nonetheless concluded:

> [W]e are persuaded by Fourth and Fifth Circuit cases supporting the position that a challenge like Venckiene's is reviewable, at least in principle. . . . . Both cases indicate that a federal court exercising its habeas corpus power can at least consider a petitioner's argument challenging the executive branch's extradition process on due process grounds. The government has provided no case in which a court declined to hear this type of extradition due process challenge. Given this lack of contrary authority, we are not inclined to say that a Secretary of State's extradition decision is *never* reviewable on due process grounds . . . . Although the circumstances in which federal courts could and should overturn the highly discretionary decision of the Secretary of State should be rare, we need not say here that judicial review is never available. . . . We therefore consider Venckiene's due process challenge in this appeal, reviewing the Secretary of State's extradition decision to determine the likelihood that Venckiene's due process claim would succeed on habeas corpus review.

*Id.* at 861(emphasis in original) (citations omitted).

The Ninth Circuit then rejected Venckiene's due process claims on the merits, a holding not germane to this Court's present ruling in Manea's case. The significance of the *Venckiene* opinion is that it affirms the jurisdiction of a federal habeas court to consider the lawfulness of the Secretary of State's extradition order. The Ninth Circuit reached the same conclusion in *Trinidad y Garcia*: "The government also suggests that the rule of non-inquiry precludes the exercise of habeas jurisdiction. But the rule implicates only the *scope* of habeas review; it does not affect habeas *jurisdiction*." 683 F.3d at 956.

These Ninth Circuit decisions militate in favor of a conclusion that this Court would have

jurisdiction to consider a habeas petition by Manea if the Secretary of State decides to order her extradition to Romania.

That conclusion is not contrary to any Second Circuit decision by which I am bound. The Government relies upon *Ahmad v. Wigen*, 910 F.2d 1063 (2d Cir. 1990), where the United States sought to extradite Ahmad to Israel to stand trial for an alleged terrorist attack upon a bus. A magistrate judge certified Ahmad's extraditability under § 3184. Before the Secretary of State considered the matter, Ahmad filed a habeas petition in the district court, on the ground, *inter alia*, that "if he is returned to Israel, he probably will be mistreated, denied a fair trial, and deprived of his constitutional and human rights." 910 F.2d at 1066. The district court rejected that ground for habeas relief, dismissed the petition, and the Second Circuit affirmed. Ahmad had included in his submissions to the district court criticisms of Israel's law enforcement procedures and treatment of prisoners. The district court took testimony and extensive documentary evidence on those issues, a procedure the Second Circuit disapproved: "This, we think, was improper," *id*. at 1067, for reasons that, if perhaps not *dicta*, are unnecessary to the court of appeals' judgment affirming dismissal of the writ: "The interests of international comity are ill-served by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced. It is the function of the Secretary of State to determine whether extradition should be granted on humanitarian grounds." *Id*. The Second Circuit concluded with this reflection: "So far as we know, the Secretary has never directed extradition in the face of proof that the extraditee would be subject to procedures or punishment antipathetic to a federal court's sense of decency. Indeed, it is difficult to conceive of a situation in which a Secretary of State would do so." *Id*.

*Ahmad v. Wigen* is distinguishable from the case at bar for several reasons. The failure of Romania's prison conditions to meet international standards is not (as in *Ahmad*) simply a contention by an individual seeking to avoid extradition to that country. Here, the Secretary of State has *already*, and over a term of years, found and reported Romania's misconduct in that regard. Given that striking circumstance, a decision like *Ahmad v. Wigen* does not preclude a habeas court from granting appropriate relief. Moreover, the Second Circuit decided *Ahmad* before the Supreme Court's opinions in *Munaf*, which together with more recent circuit cases like *Venckiene* establish a district court's jurisdiction to grant habeas relief in appropriate extradition cases. If this Court denies Manea's habeas petition out of deference to the Executive branch, and the Secretary of State thereafter refuses to except Manea from extradition to Romania notwithstanding the State Department's prior declarations that Romania's prisons "did not meet international standards," it is arguable that the "extreme case" contemplated by Chief Judge Roberts' opinion in *Munaf* would present itself, comparable to the situation envisioned by Justice Souter's concurrence: "a case in which the probability of torture is well documented, even if the Executive fails to acknowledge it."[14] Here, of course, the State Department has previously acknowledged the problem posed by prison, detention, and punishment conditions in Romania.[15]

-------

[14] The frame of reference for the opinions in *Munaf* was the detainees' contention that "their transfer to Iraqi custody is likely to result in torture." 553 U.S. at 701. Manea's objection to Romanian custody regards the conditions of Romanian detention as the equivalent of torture, a concept that probably does not meet the CAT's definition of "torture." However, wrongful conditions of incarceration can amount to a constitutional violation which is separately condemned by the CAT. The Court's reasoning in *Munaf* is equally applicable to a case where that violation "is well documented and the Executive fails to acknowledge it." *Id.* at 706.

[15] In that respect, this case may be contrasted with *Arar v. Ashcroft*, 585 F.2d 559 (2d Cir. 2009). In *Arar,* which appears to be the only Second Circuit case citing the Supreme Court's opinion in *Munaf v. Geren*, a divided *en banc* Second Circuit refused to impose *Bivens* tort liability upon

I conclude that, in the totality of these circumstances, this Court would have jurisdiction to consider whether Manea is entitled to habeas relief because a decision by the Secretary to extradite Manea would be unlawful under the Constitution and the CAT. That conclusion follows from a careful reading of *Munaf* and the subsequent Ninth Circuit opinions cited and quoted *supra*, and is not precluded by binding Supreme Court or Second Circuit authority.

For the foregoing reasons, the case comes down to this question: What order should this habeas Court make on the present record?

The parties take diametrically opposite positions. Manea contends that her showing of the wrongful nature of an extradition to Romania is strong, and asks the Court to forbid it now, before the Secretary of State comes to consider the matter. The Government contends that the Secretary must decide whether to grant or refuse extradition, and asks the Court to rule now that the principle of non-inquiry precludes any judicial review of the Secretary's decision, whatever it may be. I do not accept either of these resolutions.

Manea is not entitled to a form of habeas relief that would preclude the Secretary of State from exercising the discretionary powers the Extradition Act confers upon him. No decided case supports that proposition, which is contrary to the legal and diplomatic balance struck by Congress

---

federal officials who arranged for the plaintiff's "extraordinary rendition" to Syria, where he alleged he was tortured. Plaintiff was transferred from the United States to Syria after a Deputy Attorney General signed a "final notice of inadmissibility" which stated that plaintiff's "removal to Syria would be consistent with the CAT, notwithstanding Arar's articulated fear of torture." *Arar*, 585 F.2d at 566. In declining to fashion a *Bivens* remedy for plaintiff, the Second Circuit cited and quoted *Munaf* for the proposition that "the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is." *Id*. at 575. In *Arar*, the political branch declared that plaintiff's transfer to Syria would not violate the CAT. In the instant case, the State Department's previous declarations that Romania *does* violate the CAT suggests the likelihood that Manea's extradition to Romania would subject her to unlawful or unconstitutional conditions of detention.

in the statute: A magistrate decides whether an individual is extraditable (law); the Secretary of State decides whether the individual will be extradited (diplomacy). While I read the Court and concurring opinions in *Munaf* in Manea's favor on the existence *vel non* of judicial review of Executive action in the transfer of detainees, both opinions contemplated that the Executive (here, the Secretary) would have acted before a judicial challenge was attempted.

The Government is not entitled to a ruling at this time that the Secretary's decision on Manea's extradition to Romania, whatever it may be, is entirely immune from judicial review. For the reasons stated *supra*, I do not accept that proposition in a case where the State Department has previously identified Romanian conditions as constitutionally problematic. Apart from triggering the extradition process in response to Romania's request, the Secretary has yet to take any action on Manea's case. The Secretary may ultimately decide not to extradite Manea. In that event, Manea's need for habeas relief vanishes entirely. On the other hand, a decision by the Secretary to extradite Manea would require a description of the circumstances resulting in the decision, thereby establishing the background for a possible renewed legal challenge.

There is Supreme Court authority for this Court's declining to consider the parties' extreme positions at this time. In *Texas v. United States*, 523 U.S. 296, 300 (1998), the Court said that a dispute is not ripe for judicial determination "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *See also Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952) (A case ripe for "judicial intervention" cannot "be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them."). The Third Circuit cited these cases in *Hoxha v. Levi*, 465 F.3d 554,

565 (3d Cir. 2006), which declined to consider whether the CAT and its implementing domestic statute (the FARR) precluded judicial review under the Administrative Procedure Act of a decision by the Secretary of State to extradite a naturalized citizen to Albania to stand trial for murder:

> [T]he government argues that court review is unavailable because FARR did not abrogate the principle of non-inquiry, and that principle precludes review of the Secretary's actions. This debate is premature. The APA provides for review of "final agency action," but the Secretary of State has yet to take any action on Petitioner's case, and may ultimately decide not to extradite Petitioner. Thus, Petitioner's claim under the APA is not ripe for review, and we decline to consider it at this time. . . . [T]he ripeness doctrine clearly precludes us from resolving questions that will have practical relevance to the parties only if a contingent event occurs at some future time.

465 F.3d at 564-65.

*Hoxha* is not squarely in point, but its reasoning argues in favor of this Court denying Manea's petition for habeas corpus on the present record, and awaiting the decision of the Secretary of State about Manea's extradition before pronouncing further on her possible entitlement to habeas relief. If the Secretary decides not to extradite Manea to Romania, the case is at an end. If the Secretary decides on extradition, Manea may renew her request for habeas relief, and the Government may renew its opposition, including (if so advised) a further argument that the Court lacks jurisdiction to grant the particular relief requested.

I think it would be inadvisable, if not an abuse of discretion, for a district judge to grant or deny habeas relief in an extradition case before the Secretary of State has reached a decision about an extraditable individual.[16] "Orders of extradition are *sui generis*." *Jhirad v. Ferrandina*, 536 F.2d

---

[16] There is no legal basis to disapprove or disregard Magistrate Judge Margolis's prior certification that Manea is extraditable to Romania.

478, 482 (2d Cir. 1976). "The judicial branch plays a central but limited role in the extradition process, as laid out in the statutes and case law," and under the statutory scheme of the Extradition Act, if a judicial officer finds that the three conditions in § 3184 "have been satisfied and the accused is extraditable, the judge *must* certify the extradition to the Secretary of State. The Court has no discretion." *Venckiene*, 929 F.3d at 849. The extradition process is inherently sensitive, of life-altering importance to individuals, and directly implicates the diplomatic relations of sovereign nations. Consequently, extradition law is informed by both legal and diplomatic principles. The better practice in a case such as this, where a magistrate has certified the legal extraditability of an individual from the United States to a foreign country and the individual resists, is to await the outcome of the Secretary of State's diplomatic decision to extradite or refrain from doing so.

Given the provisions of the CAT, the Eighth Amendment, and the State Department's prior condemnations of Romanian detention and punishment practices, the Secretary would be required to include in any decision to extradite Manea a determination of the effect upon Manea of the conditions she is likely to encounter in Romania. *Cf. Trinidad y Garcia*, 683 F.3d at 956 ("The CAT and its implementing regulations are binding domestic law, which means that the Secretary of State *must* make a torture determination before surrendering an extraditee who makes a CAT claim."). If the Secretary's decision is to extradite, Manea could challenge that decision in a renewed habeas petition. Manea's present petition for habeas corpus will be DENIED, with appropriate conditions and directions that appear in the Conclusion.

## V.    CONCLUSION

For the foregoing reasons, Manea's Petition for a Writ of Habeas Corpus [Doc. 2] is decided by the Court in the following Judgment:

1. Manea's Petition for Habeas Corpus is DENIED and this civil action is DISMISSED.

2. The Denial and Dismissal directed in Paragraph 1 of this Judgment are WITHOUT PREJUDICE to the filing by Manea, if so advised, of a renewed and amended habeas corpus petition, in the event that subsequent to the entry of this Judgment, the Secretary of State of the United States decides to surrender Manea to Romanian authorities for extradition to Romania.

3. The Judgment directed in Paragraph 1 is final for the purposes of the captioned Petition, and is accordingly appealable. In order to ensure Manea's continued presence in the United States pending her consideration of whether to file a Notice of Appeal from this Judgment, the Respondent United States, the Secretary of State, and those in privity with them are STAYED from surrendering Manea for extradition to Romania, through and including **November 1, 2019.** Any further stay must be issued by the Second Circuit Court of Appeals, in the event that Manea appeals from this Judgment.

It is SO ORDERED.

Dated:   New Haven, Connecticut
September 20, 2019


*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge